Jonathan Shub (SBN 237708)
Samantha E. Holbrook (*pro hac vice* forthcoming)
Andrea L. Bonner (*pro hac vice* forthcoming)
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (610) 477-8380
jshub@shublawyers.com
sholbrook@shublawyers.com
abonner@shublawyers.com

*Attorneys for Plaintiffs and the Class*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KYMOREA JOHNSON, LILIANA BARBA-CRUZ, AND LYNETTE HERRERA-BADILLA, individually and on behalf of all similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>HOBBY LOBBY STORES, INC., an Oklahoma corporation,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Kymorea Johnson ("Johnson"), Liliana Barba-Cruz ("Barba-Cruz"), and Lynette Herrera-Badilla ("Herrera-Badilla") (collectively, "Plaintiffs") bring this class action complaint individually and on behalf of all others similarly situated against Defendant Hobby Lobby Stores, Inc. (hereafter, "Defendant" or "Hobby Lobby"). The allegations contained in this class action complaint are based on Plaintiffs' personal knowledge of facts pertaining to themselves and upon information and belief, including further investigation conducted by Plaintiffs' counsel, as to the remainder.

## I.    NATURE OF THE ACTION

1.    Advertised "sale" prices are important to consumers. Consumers are more likely to purchase a product if they believe that they are getting a good deal or purchasing that item at a "bargain" price. Further, if consumers believe that the reduced price will end soon, they are more likely to buy now, rather than wait or comparison shop, and buy something else. (*See*, Ngwe, Donald, "Fake Discounts Drive Real Revenues in Retail," Harvard Business School Working Paper (2018), at 1-2.)

2.    While legitimate sales are entirely proper and legal, deceptive sales—i.e., "sales" with fictitious original or former prices, made-up discounts, and made-up expirations—are misleading and unlawful.

3.    This is an action against Defendant for false reference pricing. Defendant routinely advertises significant "discounts" on certain products; however, these "discounts" never end and are in fact fictitious . The alleged "sale price" is just the price of the item. There is no discount.

4.    By way of background, a marketing sch that businesses unfortunately often use to promote sales is known as "strikethrough pricing" or "false reference pricing," whereby a seller advertises the "former" price of a product, which is then crossed out and replaced with a purportedly "discounted" price, either next to the stricken price or revealed after a consumer adds the item to his or her online shopping cart. These schemes have at least two purposes: (1) to induce consumers to make a purchase under

CLASS ACTION COMPLAINT

the false belief that they are getting a bargain, and (2) to create a false sense of urgency that the purported "sale" will end and then the consumer will have to pay the "full" price for the item. In reality, however, the consumer is not getting a bargain—he or she is simply buying it at or around the prevailing market price—and the "sale" is perpetual because the lower "sale" price rarely, if ever, returns to the higher "former" price.

5.    False reference pricing violates state and federal law. Yet, sellers, including Defendant, continue to engage in this tactic because they know they will be able to increase sales and profits by tricking consumers into making purchasing decisions based on the advertised reference prices. Consumers generally lack full information about products because the information available to consumers varies for different types of products. Thus, consumers are left to rely on sellers and their pricing disclosures to make their purchasing decisions.

6.    To illustrate, below is a screengrab from Defendant's Website for the "Helmet Mirrored Display Case" on January 7, 2024, which has a "former" (strikethrough or false reference) price of $129.99 and a "sale" price of $64.99.



7.    However, as explained further herein, upon information and belief, it appears that Defendant *never* advertised or sold this item for $129.99 in the three months preceding January 2, 2024.[1] That is, the price at which Defendant actually sold this item was $64.99 (a 50% "discount") the entire time, meaning the $129.99 "former" price was fake and the 50% "discount" was also fake.

8.    Defendant's products are discounted from an original price because they are marked with a price, then prominently advertised with a "__% off" sign in-store or image online.  Defendant's products are never offered for sale at an original price, but are always offered at a discounted price.

9.    The creation of a fake "sale" or "discount" creates a false sense of urgency which induces customers to purchase the item out of concern that the non-existent "sale" will end, and they will lose out on the "discount," meaning many consumers forego waiting until that item *actually* goes on sale. Based on Defendant's representations, Plaintiffs believed that they were purchasing products for which the regular price and market value was the purported "regular" or "former" price that Defendant advertised, that they were receiving a substantial discount, and that the opportunity to get that discount was seemingly time limited. These reasonable beliefs were what led Plaintiffs to buy from Defendant when they did.

10.    In reality, however, Defendant's represented prices were false. The purported "regular" prices were not the true regular prices, the purported "discounts" were not the true discounts, and the "discounts" were not time limited.

11.    This conduct artificially increases demand for the deceptively priced products and induces customers to pay more based on an impression of the products' falsely inflated value.

---

[1] The "prevailing market price" of a product sold exclusively by one retailer is the price of the product at which the retailer offered that product over the three months immediately preceding the advertisements. Cal. Bus. & Prof. Code § 17501; *Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 525 (C.D. Cal. 2015).

CLASS ACTION COMPLAINT

12.    The products at issue include all goods that have at any time been offered by Defendant, either on their Website or at one of Defendant's store locations, at a sale or discounted price from a higher "former" or "regular" price, including, but not limited to: home décor & frames, crafts supplies, and seasonal products.

13.    Consumers who visit Defendant's Website or store and buy an item on "sale" from a stricken former or "reference" price are being misled by Defendant. This is because that item has not been advertised for sale or sold, during the relevant statutory period, at the former price. Defendant's use of inflated reference prices, strikethrough pricing and "discounting," and purported limited time sales, all lead reasonable consumers to believe that the products in fact had been listed for sale and sold by Defendant at the former price, during, at a minimum, the relevant statutory period, or for a substantially longer period of time.

14.    On information and belief, all or nearly all the strikethrough prices on Defendant's Website and in their stores are false and misleading. They are not former or "regular" prices at which the products were offered for sale in the relevant statutory period or for a substantial time, if at all. They are inflated prices advertised to induce consumers into purchasing items from Defendant.

15.    Moreover, as shown below, Defendant frequently advertises purported "sales" with end dates to lead consumers to believe such "sales" will end and the prices for the items being offered at a discount during the sale period will revert to the inflated reference prices when the sale ends.

CLASS ACTION COMPLAINT

16.    In reality, however, Hobby Lobby has not ever sold any of those items at the advertised "all or nearly all of the items remain substantially discounted after the purported sale's end date, i.e., none or almost none of them items revert back to the reference prices advertised by Hobby Lobby. This is intended to create a false sense of urgency and prompt consumers to make purchases they would not have otherwise made.

17.    In addition, on information and belief, even when Defendant does not advertise a certain end date to their purported sales, Defendant frequently advertise sales with deep discounts that reasonable consumers would reasonably believe are limited in duration because the items appear to be marked down so significantly that no reasonable consumer would believe that such "sales" would continue indefinitely.

18.    Reasonable consumers, including Plaintiffs, believe that the "regular"

prices Defendant advertises represents the prevailing prices that Defendant typically sells the products at, and that they are receiving reductions from those "regular" prices in the amounts advertised. Accordingly, when consumers purchased these products at a manufactured "discounted" price, consumers did not receive the product they believed they received at full value and purchased at a discount. To illustrate, assume a consumer is willing to purchase an item for $35. But to motivate consumers psychologically, and thus increase revenue and capture market share, the company advertises the product as having a "regular" price of $80 and being on "sale" at 50% off (i.e., $40 off). Because consumers value products based on the false reference price, a product falsely advertised at 50% off leads the consumer to believe he is getting an item worth $80 for $40. The consumer thinks he is getting a good deal, but he has been fleeced because he actually paid $5 more for the item that he otherwise would have been willing to pay due to Defendant's psychological manipulation regarding the "regular" price or value of the item. The misrepresentation also creates a false sense of urgency. Thus, consumers make purchases they would not otherwise have made.

19.     As a result of this psychological baiting, consumers are not only deceived into spending money they otherwise would not have spent, but also purchasing items they would not have purchased, and spending more money for an item than they otherwise would have, had Defendant not engaged in false advertising.

20.     Consumers also rely on retailers to provide accurate reference prices. The damage to any single consumer in any single transaction related to the purchase of a single item may seem relatively small. However, when multiplied by millions of sales transactions over the course of several years, Defendant deceptively and unlawfully walks away with tens, if not hundreds, of millions of dollars in additional revenue compared to a business model that does not employ such deceptive advertising practices. The enhanced revenue likely explains why Defendant has a long history of engaging in false reference pricing despite the fact that in the last decade they have

CLASS ACTION COMPLAINT

acknowledged the unlawfulness of the practice and have been sued for such practices repeatedly. *See Infra* Section IV.H.

## II.    PARTIES

### Plaintiffs

21.    Plaintiff Kymorea Johnson is a resident of the State of California and County of San Francisco County. She was present in San Francisco County at the time she made her purchases from Defendant's Website.

22.    Plaintiff Liliana Barba-Cruz is a resident of the State of California and County of San Joaquin. She was present in San Joaquin, San Mateo, and Stanislaus Counties at the time she made her various purchases at Defendant's store locations.

23.    Plaintiff Lynette Herrera-Badilla is a resident of the State of California and County of Fresno. She was present in Fresno County at the time she made her purchase at Defendant's store location.

### Defendant

24.    Defendant Hobby Lobby Stores, Inc. is an Oklahoma corporation. Defendant is an online and brick-and-mortar "arts-and-crafts retailer" of products, including without limitation: picture frames, custom picture frames, home décor, floral and wedding products, seasonal products, party supplies, wearable art, hobby products, craft supplies, sewing supplies, furniture, jewelry making supplies, and yarn. Through its website and physical stores, Defendant sells its products to consumers in California and nationwide. Defendant is headquartered in Atlanta, Georgia.

## III.    JURISDICTION & VENUE

25.    This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (i) there are at least 100 Class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one putative class member and one Defendant are citizens of different states.

26.    This Court also has subject matter jurisdiction over this Action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy in this case exceeds $75,000 and this action is between citizens of different states. Plaintiffs are residents of California whereas Defendant is an Oklahoma entity with its principal places of business in Oklahoma as well.

27.    Defendant is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this State, including Defendant's marketing to Plaintiffs, sales to Plaintiffs, and Defendant's ownership and operation of approximately 67 stores within the State of California. Accordingly, Defendant has sufficient minimum contacts in California to render the exercise of jurisdiction by the California courts consistent with traditional notions of fair play and substantial justice.

28.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant named in this Action transacts business within this district and a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

## IV.    GENERAL ALLEGATIONS

### A.    Company Background

29.    Defendant Hobby Lobby Stores, Inc. is an Oklahoma corporation that was founded in 1970.[2] With more than 1,000 stores and operations in forty-eight states, Hobby Lobby is the largest privately owned "arts-and-crafts retailer" in the world. Defendant offers over 70,000 different products including, without limitation to, home décor, seasonal décor, furniture, tableware, seasonal products, wearable art, floral products, art supplies, craft supplies, party supplies, hobby supplies, wedding supplies, fabric, jewelry making supplies, craft supplies, sewing supplies, and yarn.

30.    Defendant sells its products both through its "Website" and its 1,000 brick-

---

[2] https://www.hobbylobby.com/about-us/our-story (last visited Dec. 14, 2024).

and-mortar stores that are located in forty-eight states, sixty-seven of which operate in California. Defendant generated $7.9 billion in revenue during 2023.

**B.    Defendant's Pricing Scheme Is False and Deceptive Because The Products Are Not Sold at Hobby Lobby at the Former Reference Prices**

31.    Defendant's business model relies on deceiving consumers with false or misleading advertisements.

32.    On any given date, many products at Hobby Lobby are represented as being discounted from a substantially higher reference or former price. On information and belief, products are offered at the same prices both in-store and on Hobby Lobby's Website. On Hobby Lobby's Website, for example, the supposed markdowns are represented to the consumer by prominently displaying a "crossed-out" reference price next to the sale price, which is displayed in bold red font. A representative example is shown below.



Black Wood Collage Wall Frame

~~$69.99~~ $34.99

33.    Hobby Lobby also advertises supposed mark downs by way of a "Weekly

Ad," which is provided both on its website[3] and as a hard copy in stores. For example, attached as **Exhibit A** is a copy of Hobby Lobby's Weekly Ad for the week of December 13, 2021.

34.     Additionally, throughout Hobby Lobby's brick-and-mortar stores, Defendant displays signs advertising supposed sales. A representative example is shown below.

 

35.     Another means of advertising employed by Hobby Lobby is their offering of various in-store and online weekly flyer ads. For example, below is a flyer advertising custom picture frames as being "Always 50% off the marked price."

36.     Defendant employs these deceptive tactics to falsely convey to customers that the product was formerly listed or sold on the Website at the reference price in the recent past and for a substantial period of time, but is now being listed and sold to the customer at a substantial discount.

37.     By way of background, the way false reference pricing is evaluated

---

[3] https://www.hobbylobby.com/weekly-ad (last visited Dec. 14, 2024).

depends significantly on whether the product is exclusive or non-exclusive. Exclusive products are products that are sold exclusively by one retailer. The "prevailing market price" of an exclusive product is the price of the product at which the retailer offered that product over the three months immediately preceding the advertisements. Cal. Bus. & Prof. Code § 17501; *Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 525 (C.D. Cal. 2015). Thus, if the advertised reference price of the exclusive item exceeds that prevailing market price, then the advertisement is deceptive.[4] *Spann*, 307 F.R.D. at 525. On the other hand, non-exclusive products are products that are sold by multiple retailers. The "prevailing market price" of a non-exclusive product is determined by the prices at which multiple retailers in the market offered that product over the three months immediately preceding the advertisements. Cal. Bus. & Prof. Code § 17501; *Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1085 (C.D. Cal. 2018).

38.     Regardless of whether the item is exclusive or non-exclusive to Hobby Lobby, the higher reference price that Defendant advertises is typically a falsely inflated price because they rarely, if ever, list or sell items at the advertised reference price. The sole purpose of the false reference price is to mislead customers into believing that the displayed reference price is a former or regular price at which Defendant previously sold that product at. As a result, Defendant falsely conveys to customers that they are receiving a substantial markdown or discount, thus inducing them to make a purchase before the "sale" ends. Representative examples of such false and misleading advertising, i.e., products having never been sold at the false reference price over the course of several months, are shown below.

39.     On information and belief, as discussed further *Infra* Section IV.H, this is not a new or isolated sales practice by Defendant, but a practice that has continued

---

[4] For example, "[a] furniture dealer runs [an] advertisement which offers a couch which he claims was formerly selling for $100 but is now selling for $50. Unless the price which he advertises as the former price actually coincides with the "prevailing market price" of the couch within the next preceding three months ... the advertisement is again false and deceptive." *Spann*, 307 F.R.D. at 525 (quoting Attorney General Opinion No. 57–126).

CLASS ACTION COMPLAINT

consistently for years throughout the statutory period and is still ongoing.

40.     These pricing and advertising practices are deceptive and pressure consumers into purchasing products from Defendant at an inflated price out of fear that they will miss out on a limited-time sale. Defendant intends to mislead consumers into believing that they are getting a bargain by buying products from Hobby Lobby on sale and at a substantial discount. Defendant does so with the intention of promoting sales, increasing sales revenue, and for the purpose of disposing of products that it has in inventory. For many products, Defendant does not offer or sell the products at the reference price for a substantial time, if at all. The reference price is, therefore, artificially inflated, and the advertised discounts are deceptive.

**C.      Hobby Lobby's Intentions Underlying Its False-Reference Pricing Scheme**

41.     Defendant knew or should have known that its use of false reference prices was misleading consumers to believe that they were receiving a "bargain" when they, in fact, were not.

42.     Moreover, Defendant intended for reasonable consumers to understand the "sale" prices to be prices that Hobby Lobby had reduced from Hobby Lobby's "regular" or "former" prices. Defendant intentionally failed to disclose to Plaintiffs and Class members the truth about its reference prices, i.e., that they were fabricated, and that Defendant never offered the items at the reference prices during the relevant statutory period. Defendant intentionally sought to convey to consumers that it was receiving a true markdown.

43.     Defendant intentionally and deliberately implemented a pricing scheme that was designed to mislead its customers to believe that the reference prices it used were: (a) the prices that the advertised product was formerly listed at; and/or (b) the prevailing market rate of the advertised product.

1

2

**D.     Plaintiffs' Experiences**

**Plaintiff Johnson's Purchases from the Website and In-Store**

3     44.     Plaintiff Johnson purchased Hobby Lobby falsely discounted items during

4     the statutory period including, but not limited to, November 8, 2023.  She purchased

5     falsely discounted buttons, patches, crystals, charms, pendants, brooches rhinestones, to

6     name a few crafting and jewelry making items.  The items were purchased online and

7     shipped to her address in San Francisco, California.  When viewing these items for sale,

8     she observed the original price with a strikethrough, immediately next to the falsely

9     discounted price. Most of the items were discounted a significant percentage such as

10    50%.  An example of the false discount representation is as follows:  2.99 ~~$5.99~~   This

11    indicates an original price of $5.99 and a discount to $2.99.  Also, immediately below

12    the strikethrough pricing for this item is the percentage discount, i.e., 50%.

13    45.     Additionally, during the statutory period, Johnson purchased jewelry

14    making items at a falsely marked discount of 50% at both the San Mateo and Hayward

15    Hobby Lobby locations.  The items were near signs prominently placed that advertised

16    the items discounted at "50% Off" the regular price in large font. Some signs may have

17    had an asterisk noting a disclaimer in smaller print stating, "Discounts provided every

18    day; marked prices reflect general U.S. market value for similar products."  However,

19    if that disclaimer was on any of the particular signs that Johnson viewed, she did not see

20    it. She also recalls on some signs near the discount percentage large font, "The everyday

21    price" or "Our everyday price."  She viewed the in-store signs as she approached the

22    items in the aisle at a distance and the prominent and larger font with the percentage

23    discount i.e., "50% Off" was visible.

24    46.     Upon information and belief, even if the disclaimer had been on any of the

25    signs that Johnson saw, the terms "U.S. market value" were not defined on any of them.

26    Moreover, Johnson did not observe any definition of said terms on the signs. The smaller

27    font was not clearly visible.  Johnson purchased the items after viewing the advertised

28

CLASS ACTION COMPLAINT

sign indicating 50% off.

47.    A substantially similar sign is represented:



48.    Johnson also viewed the Weekly Ad flyer that was available online and in-store.  The Weekly Ad indicated that jewelry making supplies were 50% off and paper crafts were 40% off, in a manner that was substantially similar to the Weekly Ad provided below.  Johnson did not observe an asterisk next to any of the Weekly Ad flyer's percentage discount representations.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







CLASS ACTION COMPLAINT

49.    Johnson did not see or read the very small font asterisked at the bottom of the Weekly Ad flyer: "*Discounts provided every day, marked prices reflect U.S. market value for similar products." The disclosure was barely visible.  The terms "U.S. market value" were not defined in the flyer.

50.    In all instances, Johnson relied on the signs and Weekly Ads and understood the signs were discounts and simple, plain language discounts off an original price that was the recent original price in the local marketplace. Based on the Weekly Ad and signs, Johnson understood that the discounts were only available for a limited time.

**Plaintiff Barba-Cruz's In-Store Purchases**

51.    Plaintiff Barba-Cruz purchased in-store items during the statutory period including on or about August 10, 2024, September 21, 2024, October 26, 2024, and December 24, 2024.

52.    On August 10, 2024, at the Modesto, California Hobby Lobby retail store, Barba-Cruz purchased falsely discounted jewelry making items, toys, and Christmas items that were falsely marked as "50% Off." On the same day, in the same store, Barba-Cruz also purchased paper crafts, craft items, and wearable art that were falsely marked as "30% Off."

53.    On September 21, 2024, at a retail Hobby Location in Northern California Barba-Cruz purchased falsely discounted products. Specifically, Christmas items were falsely marked as "50% Off," Christmas lights were at falsely marked as "25% Off," and fall items at were falsely marked 40% off.

54.    On October 26, 2024, at the Tracy, California Hobby Lobby retail store, Barba-Cruz purchased falsely discounted Christmas and jewelry making items, which were both falsely marked as "50% Off."

55.    On November 16, 2024, at a retail Hobby Location in Northern California, Barba-Cruz purchased falsely discounted products including, wearable art that was

CLASS ACTION COMPLAINT

falsely marked as "30% Off," and Christmas items and jewelry making items which were both falsely marked as "50% Off."

56.     On December 4, 2024, Barba-Cruz purchased falsely discounted products including, wearable art that was falsely marked as "30% Off", and  Christmas items and discounted jewelry making items which were both falsely marked as "50% Off."

57.     The items were near signs prominently placed that advertised the items discounted the relevant percentage off the regular price in large font. Some signs may have had an asterisk noting a disclaimer in smaller print stating, "Discounts provided every day; marked prices reflect general U.S. market value for similar products." However, if that disclaimer was on any of the particular signs that Barba-Cruz viewed, she did not see it.   She does recall on some signs near the discount percentage large font, "The everyday price" or "Our everyday price."  She viewed the in-store signs as she approached the items in the aisle at a distance and the prominent and larger font with the percentage discount, i.e., 50%,  was visible.

58.     Upon information and believe, even if the disclaimer had been on any of the signs that Barba-Cruz had observed, the terms "U.S. market value" were not defined any of them it. Moreover, Barba-Cruz  did not observe any definition of said terms on the signs. The smaller font was not clearly visible.  Barba-Cruz purchased the items after viewing the advertised sign indicating the relevant percentage discount.

59.     A substantially similar sign is represented as follows:



CLASS ACTION COMPLAINT

60.    Barba-Cruz also viewed the Weekly Ad flyer that was available online and in-store.  The Weekly Ad indicated jewelry making supplies were 50% off and paper crafts were 40% off, in a manner that was substantially similar to the Weekly Ad provided below.  Barba-Cruz did not observe an asterisk next to any of the Weekly Ad flyer's percentage discount representations.



CLASS ACTION COMPLAINT

61.    Barba-Cruz did not see or read the very small font asterisked at the bottom of the Weekly Ad flyer: "*Discounts provided every day, marked prices reflect U.S. market value for similar products." The disclosure was barely visible.   The terms "general U.S. market value" were not defined in the flyer.

62.    In all instances, Barba-Cruz relied on the signs and Weekly Ads and understood the signs were discounts and simple, plain language discounts off an original price that was the recent original price in the local marketplace. Based on the Weekly Ad and signs, Barba-Cruz understood that the discounts were only available for a limited time.

**Plaintiff Herrera-Badilla's In-Store Purchases**

63.    Lynette Herrera-Badilla purchased in-store items during the statutory period including in or about Fall and Winter 2023.  In or about Fall and Winter 2023, at the Fresno, California Hobby Lobby retail store, Herrera-Badilla purchased a clock, art, frames, craft items, holiday decor, chargers, party goods, and Christmas items. All items were falsely marked as either 30%, 40% or 50% off.

64.    The items were near signs prominently placed that advertised the items discounted at 30%, 40% or 50% off the price. The home decor items were marked "50% Off." Some signs may have had an asterisk noting a disclaimer in smaller print stating, "Discounts provided every day; marked prices reflect general U.S. market value for similar products."  However, if that disclaimer was on any of the particular signs that Herrera-Badilla viewed, she did not see it. While she saw the large 40% , 30% and 50% off discount in large font, she did not see the smaller font. She also recalls on some signs near the discount percentage large font, "The everyday price." She viewed the in-store signs as she approached the items in the aisle at a distance and the prominent and larger font with the percentage discount, i.e., "50% Off" was visible.

65.    Upon information and belief, even if the disclaimer had be on any of the signs that Herrera-Badilla saw, the term "U.S. market value" was not defined in the

flyer. The smaller font was not clearly visible.  Herrera-Badilla purchased the items after viewing the advertised sign indicating the relevant percentage discount.

66.    Herrera-Badilla also viewed the Weekly Ad flyer that was available online and in-store.   The Weekly Ad indicated that home decor was "50% Off" and that Christmas party and tableware was "50% Off," in a manner that was substantially similar to the Weekly Ad provided.  Herrera-Badilla did not observe an asterisk next to any of the Weekly Ad flyer's percentage discount representations.



67.    Herrera-Badilla did not see or read the very small font asterisked at the bottom of the Weekly Ad flyer: "*Discounts provided every day, marked prices reflect U.S. market value for similar products." The disclosure was barely visible.  The terms "general U.S. market value" were not defined in the flyer.

68.    In all instances, Herrera-Badilla  relied on the signs and Weekly Ads and understood the signs were discounts and simple, plain language discounts off an original price that was the recent original price in the local marketplace. Based on the Weekly Ad and signs, Herrera-Badilla  understood that the discounts were only available for a limited time.

**E.    Research Shows That Reference Price Advertising Influences Consumer Behavior and Perceptions of Value**

69.    Deceptive pricing practices have drawn the scrutiny and analysis of mainstream media and several academic studies.

70.    Retailers like Defendant can benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get **higher margins**, but also **increase sales**." Staelin et al., *Competition and the Regulation of Fictitious Pricing*, 87 J. MKTG., 826, 835 (2023) (emphasis added).

71.    Retailers "mark up the prices and then offer seemingly deep discounts to make the deals look more attractive," reports Jie Zhang, a professor of marketing at the University of Maryland. "This is a form of deceptive pricing."[5] This tactic is meant to trick shoppers into thinking they are getting a better price than usual.

72.    Consumers' Checkbook, a nonprofit consumer-advocacy publication, tracked the prices of more than 25 items at 24 major retailers over 33 weeks last year. Researchers concluded that at eight companies, more than half of the items they tracked

---

[5] Jaclyn Peiser, *A common, illegal tactic retailers use to lure consumers*, The Washington Post (Nov. 21, 2023), available: https://www.washingtonpost.com/business/2023/11/21/fake-sale-deceptive-pricing/ ("Washington Post Article").

"were offered at false discounts every week or almost every week we checked."[6]

73.    Luc Wathiue, a professor of marketing at Georgetown University, says that this is an effective technique because shoppers usually aren't tracking prices that closely. "As consumers, we don't know what the right price should be, so we use cues in the environment to determine whether the price that we have in front of us is advantageous."[7]

74.    "By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."[8] Thus, "empirical studies indicate that, as discount size increases, consumers' perceptions of value and their willingness to buy the product increase, while their intention to search for a lower price decreases."[9]

75.    "[D]ecades of research support the conclusion that advertised reference prices do indeed enhance consumers' perceptions of the value of the deal."[10] According to academic studies, "[c]onsumers are influenced by comparison prices even when the stated reference prices are implausibly high."[11]

76.    According to Jie Zhang, the "psychological effect works" for tricking consumers into believing that they are receiving a good deal. "It's a very strong and robust effect, so I'm not surprised those retailers actually resorting to this tactic, because time and time again it works."[12]

---

[6] *See id.*
[7] *See id.*
[8] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (Spring 1992). "[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price." *Id.*; Patrick J. Kaufmann et al, *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. RETAILING 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").
[9] *Id.* at 56.
[10] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Believe It Or Not*, J. OF CONSUMER AFFAIRS, Vol. 36, No. 2, at 287 (Winter 2002).
[11] *Id.*
[12] Washington Post Article.

77.    Another academic journal explains that "[r]eference price ads strongly influence consumer perceptions of value . . . . Consumers often make purchases not based on price but because a retailer assures them that a deal is a good bargain. This occurs when . . . the retailer highlights the relative savings compared with the prices of competitors . . . [T]hese bargain assurances (BAs) change consumers' purchasing behavior and may deceive consumers."[13]

78.    "[R]esearch has shown that retailer-supplied reference prices clearly enhance buyers' perceptions of value" and "have a significant impact on consumer purchasing decisions."[14]

79.    "[R]eference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product."[15] This study also concluded that "consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[16]

80.    According to a OnePoll survey, 67% of respondents said the cost-of-living pressures made them more desperate to find the best deals, and 71% believe they are "saving money" by buying products that are on sale, even if the price reduction is not genuine.[17]

81.    Additionally, a product's "price is also used as an indicator of product quality."[18] In other words, consumers view Defendant's deceptive advertised reference

---

[13] Joan Lindsey-Mullikin & Ross D. Petty, *Marketing Tactics Discouraging Price Search: Deception and Competition*, 64 J. OF BUS. RESEARCH 67 (January 2011).

[14] Praveen K. Kopalle & Joan Lindsey-Mullikin, *The Impact of External Reference Price On Consumer Price Expectations*, 79 J. OF RETAILING 225 (2003).

[15] Jerry B. Gotlieb & Cyndy Thomas Fitzgerald, *An Investigation Into the Effects of Advertised Reference Prices On the Price Consumers Are Willing To Pay For the Product*, 6 J. OF APP'D BUS. RES. 1 (1990).

[16] *Id.*

[17] Megan Tatum, *Bargain debasement: why are 'fake discounts' on the rise?*, Raconteur (June 23, 2023), available: https://www.raconteur.net/economy-trends/fake-discounts-online-retail.

[18] Grewal, *supra* note 8, at 54; see also Richard Thaler, *Mental Accounting and Consumer Choice*, MARKETING SCIENCE 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve

prices as a proxy for product quality.

82.    As such, research confirms that deceptive advertising through false reference pricing is intended to, and, in fact does, influence consumer behavior. By artificially inflating consumer perceptions of an item's value and causing consumers to spend money they otherwise would not have, consumers purchase items they otherwise would not have, and/or purchase products from a specific retailer believing that they are receiving a "discount."

### F.    Consumers Suffered Economic Harm

83.    Based on Defendant's advertisements, reasonable consumers would expect that the listed former prices are the "regular" prices at which Defendant sells that product; that these are former prices that Defendant sold the product at before the discount was introduced, and that these are the prevailing prices at Hobby Lobby. Put another way, reasonable consumers reasonably believe that, prior to the supposedly time-limited sale, consumers had to pay the "regular" price to get the item and did not have the opportunity to get a discount from that "regular" price, through a sale or otherwise.

84.    Reasonable consumers would also expect that, if they purchase during the sale, they will receive an item for which the regular price and/or market value is the advertised regular price and that they will receive the advertised discount from the regular purchase price.

85.    Consumers, including Plaintiffs and putative Class members, paid a "price premium" for the products that they otherwise would not have paid if the reference prices that Defendant used were omitted from the product listings. Or, consumers would not have purchased the products at all, and Defendant would not have been able to charge the prices they ultimately did.

---

as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

86.     Consumers who are presented with sale prices or discounts are more likely to make the purchase. Research shows that more than 64% of online consumers wait to buy things until they go on sale. Nearly two-thirds of consumers surveyed admitted that a promotion or a coupon often closes the deal, if they are wavering or are undecided on making a purchase.[19] As such, the lure of getting an item at a discount impacts a consumer's decision as to whether to purchase a product or not.

87.     Accordingly, Defendant's advertisements harm consumers by inducing them to make purchases based on false information. In this same vein, Defendant's advertisements artificially increase consumer demand for Defendant's products, putting upward pressure on the prices that Defendant can charge for its products. Consequently, Defendant can charge a price premium for their products that they would not be able to charge absent the misrepresentations about the former prices. Defendant's misrepresentations caused Plaintiffs to pay more for the products they purchased than they otherwise would have.

## G.    Defendant's Deceptive Pricing Practice Violates the Law

88.     The Federal Trade Commission Act ("FTCA") prohibits the pricing scheme employed by Defendant regardless of whether the product advertisements and representations use the words "regular," "original," or "former" price. Under 16 C.F.R. § 233.1(e):

> If the former price is set forth in the advertisement, ***whether accompanied or not*** by descriptive terminology such as "Regularly," "Usually," "Formerly," etc., the advertiser should make certain that the former price is not a fictitious one. If the former price, or the amount or percentage of reduction, is not stated in the advertisement, as when the ad merely states, "Sale," the advertiser must take care that the amount of reduction is not so insignificant as to be

---

[19] Khalid Saleh, *How Discounts Affect Online Consumer Buying Behavior*, INVESP (June 16, 2024), available: https://www.invespcro.com/blog/how-discounts-affect-online-consumer-buying-behavior/.

meaningless. It should be sufficiently large that the consumer, if he knew what it was, would believe that a genuine bargain or saving was being offered. An advertiser who claims that an item has been "Reduced to $9.99," when the former price was $10, is misleading the consumer, who will understand the claim to mean that a much greater, and not merely nominal, reduction was being offered.

89.     The FTCA also prohibits "unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a)(1). Under FTC regulations, false former pricing schemes like the ones employed by Defendant are deceptive practices that violate the FTCA.

90.     Pursuant to 16 C.F.R. § 233.1, entitled Former Price Comparisons:

(a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the ***former price*** is the actual, bona fide price at which the article was offered to the public on a ***regular basis*** for a ***reasonably substantial period of time***, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an ***artificial, inflated price*** was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. (Emphasis added).

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a ***reasonably substantial period of time***, in the ***recent***, regular course of her business, honestly and in good faith – and, of

course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. (Emphasis added).

(c) The following is an example of a price comparison based on a fictitious former price. John Doe is a retailer of Brand X fountain pens, which cost him $5 each. His usual markup is 50 percent over cost; that is, his regular retail price is $7.50. In order subsequently to offer an unusual "bargain," Doe begins offering Brand X at $10 per pen. He realizes that he will be able to sell no, or very few, pens at this inflated price. But he doesn't care, for he maintains that price for only a few days. Then he "cuts" the price to its usual level—$7.50—and advertises: "Terrific Bargain: X Pens, Were $10, Now Only $7.50!" ***This is obviously a false claim***. The advertised "bargain" is not genuine. (Emphasis added).

(d) Other illustrations of fictitious price comparisons could be given. An advertiser might use a price at which he ***never offered the article at all***; he might feature a price which was ***not used in the regular course of business***, or which was ***not used in the recent past*** but at some ***remote period in the past***, without making disclosure of that fact; he might use a price that was not openly offered to the public, or that was ***not maintained for a reasonable length of time***, but was immediately reduced. (emphasis added).

91.    The FTCA also prohibits retailers from offering fake limited duration sales. *See* 16 C.F.R.§233.5 which provides:

[Retailers] should not represent that they are selling at "factory" prices when they are not selling at the prices paid by those purchasing directly from the manufacturer. . . . They should not offer an advance sale under circumstances where they do not in good faith expect to increase the price at a later date, or make a 'limited' offer which, in fact, is not limited.

- 27 -
CLASS ACTION COMPLAINT

92.    Plaintiff Johnson purchased her products online from her residence in California. Barba-Cruz, and Herrera-Badilla purchased their product in Hobby Lobby stores located in California. Defendant's pricing practices also violate California law. Section 17500 of California's False Advertising Law prohibits businesses from making statements they know or should know to be untrue or misleading. Cal. Bus. & Prof. Code § 17500. This includes statements falsely suggesting that a product is on "sale," when it actually is not.

93.    Moreover, section 17501 of California's False Advertising Law specifically provides that "[n]o price shall be advertised as a former price . . . unless the alleged former price was the prevailing market price . . . within three months next immediately preceding" the advertisement. Cal. Bus. & Prof. Code § 17501.

94.    Further, California's Consumer Legal Remedies Act prohibits "advertising goods or services with the intent not to sell them as advertised" and specifically prohibits "false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code § 1770(a)(9), (13).

95.    Additionally, California's unfair competition law bans unlawful, unfair, and deceptive business practices. Cal Bus. & Prof. Code § 17200.

96.    As described herein, Defendant makes false and misleading statements about its prices and discounts. Defendant advertises "regular" prices that are not actually their "regular" or former prices, and were not the prevailing market price in the three months immediately preceding the advertisements. Additionally, Defendant advertised goods or services with the intent not to sell them as advertised. For example, Defendant advertised that goods had certain former prices and/or market values even though they never intended to sell those goods at those former prices and/or market values. Defendant made false and/or misleading statements concerning the reasons for, existence of, and amounts of price reductions. Such false or misleading statements were made in the context of site-wide and store-wide discounts, discounts on categories of

items, and individual items. Defendant engaged in unlawful, unfair, and deceptive business practices by virtue of this deceptive pricing scheme.

**H.     Hobby Lobby Has a Repeated History of Engaging in this Fraudulent Pricing Scheme**

97.     Hobby Lobby's conduct is not new or isolated. To the contrary, Hobby Lobby has faced backlash for over a decade for engaging in nearly identical pricing schemes. This practice drew the scrutiny of consumer advocates and prompted several lawsuits and investigations by state Attorney Generals against Hobby Lobby, beginning around 2014.

98.     In 2014, Hobby Lobby was the subject of an investigation by the New York Attorney General's Office into their deceptive advertising practices. The investigation identified Hobby Lobby's practice of advertising "products as sales items, typically marked down by 30 percent or 50 percent, for more than 52 consecutive weeks."[20] Attorney General Eric Schneiderman condemned this practice, stating, "[w]hen companies mislead customers by advertising never-ending sales, our office will hold them accountable. Ultimately, a permanent sale is no sale at all."[21]  Ultimately, Hobby Lobby agreed to pay $85,000 civil penalties, distribute $138,600 in gift cards to schools in upstate New York, and promised to "change its advertising practices over the next 60 days" after the settlement.

99.     Nevertheless, in 2017, Hobby Lobby was investigated by the Virginia Attorney General's Office for engaging in the same deceptive pricing scheme.[22]

---

[20] Jonathan Stempel, *Hobby Lobby Settles NY Probe into Alleged Bogus Sales*, REUTERS (Jun. 12, 2014) https://www.reuters.com/article/business/media-telecom/hobby-lobby-settles-ny-probe-into-alleged-bogus-sales-idUSL2N0OT0MA/

[21] Ricardo Lopez, *Hobby Lobby Settles New York Suit That Accused it of False Advertising*, LOS ANGELES TIMES (Jun. 12, 2024) https://www.latimes.com/business/la-fi-hobby-lobby-false-advertising-settlement-20140612-story.html#:~:text=Sales%20that%20are%20never%2Dending,is%20no%20sale%20at%20all

[22] Michael Kelly, *Hobby Lobby to Change Advertising Practices as Part of Settlement*, Virginia Office of the Attorney General (Mar. 6, 2017) https://oag.state.va.us/consumer-

Specifically, Hobby Lobby routinely advertised discounts and never disclosed the local marketplace price comparator as required by law, making it difficult for customers to figure out if they were actually getting a good price. The Attorney General and Hobby Lobby ultimately reached a settlement and Hobby Lobby agreed to pay civil penalties and was permanently enjoined from engaging its unlawful false reference pricing practices, in violation of Comparison Price Advertising Act.[23]

100.   Additionally, upon information and belief, at least three lawsuits have been filed against Hobby Lobby challenging the same deceitful pricing practices complained of herein. Indeed, in 2018, a class action was brought against Hobby Lobby because it advertised products as "50% off" despite "never [being] offered for sale or sold at that price within the 90-day period preceding [Plaintiff's] purchase." *Chase v. Hobby Lobby Stores, Inc.*, No. 17-cv-00881-GPC-BLM (S.D. Cal. Feb. 8, 2018), ECF No. 30. Upon information and belief, the case ultimately reached a confidential settlement.

101.   In 2016 and 2018, two different class actions, which were ultimately consolidated, were filed against Hobby Lobby for advertising products as "Always 30% off," a "reduction from another price that is never charged to a customer." *See Phillips v. Hobby Lobby Stores*, No. 2:16-cv-00837-JHE (N.D. Ala. Sept. 30, 2019), ECF No. 1; *see also Marcrum v. Hobby Lobby Stores*, No. 2:16-cv-00837-JHE (N.D. Ala. June 4, 2018). In denying Hobby Lobby's argument for summary judgment, the court acknowledged that this practice was a "form[] of bargain advertising where the seller offers a reduction from its own former price for an article" in violation of 16 C.F.R. § 233.1. *See Phillips*, No. 2:16-cv-00837-JHE (N.D. Ala. Dec. 16, 2019), ECF No. 116, p. 18 (cleaned up). Ultimately, the parties reached a class wide settlement. *See Phillips*, No. 2:16-cv-00837-JHE (N.D. Ala. Aug. 30, 2021).

102.   Defendant is a repeat bad actor. It continues to make its profits a priority

---

protection/index.php/news/203-march-6-2017-hobby-lobby-to-change-advertising-practices-as-part-of-settlement

[23] *Id.*

1    by continuing to engage in deceptive and illegal pricing practices. Defendant has been

2    the subject of litigation time and again for deceiving consumers with their false

3    reference pricing scheme, and yet it continues these practices to this day.

4        103.   Even though Hobby Lobby formerly represented that it had changed its

5    pricing practices, the allegations and evidence herein demonstrates that it is continuing

6    to engage in the exact same conduct, demonstrating a blatant disregard for its prior

7    commitments and the law.

8                    **V.    CLASS ACTION ALLEGATIONS**

9        104.   Plaintiffs bring this action on behalf of themselves, and all persons

10   similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules

11   of Civil Procedure and seek certification of the following classes (collectively, the

12   "Class"):

13           **Nationwide Class:** All persons who purchased one or more items from Hobby

14           Lobby during the Class Period at a discount from an advertised higher

15           reference price (the "Nationwide Class" or "Class").

16           **California Subclass:** All persons in California who purchased one or more

17           items from Hobby Lobby during the Class Period at a discount from an

18           advertised higher reference price (the "California Subclass").

19       105.   Excluded from the Class is Defendant, as well as its officers, directors,

20   employees, agents or affiliates, parent companies and/or subsidiaries, and each of their

21   respective officers, employees, agents or affiliates, and any judge who presides over this

22   action. Also excluded from the Class are persons or entities that purchased products

23   from Defendant for purposes of resale.

24       106.   The "Class Period" is the time period beginning on the date established by

25   the Court's determination of any applicable statute of limitations, after consideration of

26   any tolling, discovery, concealment, and accrual issues, and ending on the date of entry

27

28

of judgment.[24]

107.   Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions stated above, including the addition of one or more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

108.   **Numerosity.** The Class is so numerous that joinder of all members in one action is impracticable. The exact number and identities of the members of the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, but on information and belief, Plaintiffs allege that there are at least tens of thousands of members of the Class.

109.   **Typicality.** Plaintiffs' claims are typical of the claims of the Class members because, inter alia, all Class members have been deceived (or were likely to be deceived) by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

110.   **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs have retained attorneys who are experienced in the handling of complex consumer class action litigation, and Plaintiffs and their counsel intend to vigorously prosecute this action. Plaintiffs have no antagonistic or adverse interest to those of the Class.

111.   **Existence and Predominance of Common Questions of Law or Fact.** Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary among members of the Class, and which may be determined without reference to the individual circumstances of any member of the

---

[24] The Class Period begins at minimum 4 years from the date of filing of this action, but based on tolling, may extend beyond that date.

CLASS ACTION COMPLAINT

Class, include, but are not limited to, the following:

A.  Whether, during the Class Period, Defendant advertised false reference prices on products offered on the Website and/or in stores.

B.  Whether, during the Class Period, the original price advertised by Defendant was the prevailing market price for the products in question during the three-month period preceding the dissemination and/or publication of the advertised former prices.

C.  Whether, during the Class Period, Defendant advertised price discounts from false reference prices on products offered on the Website.

D.  Whether the products listed on Defendant's Website and/or in stores during the Class Period were offered at their reference prices for any reasonably substantial period of time prior to being offered at prices that were discounted from their reference prices.

E.  Whether Defendant's alleged conduct constitutes violations of the laws asserted.

F.  Whether Defendant engaged in false or misleading advertising.

G.  Whether Defendant's deceptive pricing scheme using false reference prices constitute an "unlawful," "unfair," or "fraudulent" business practice in violation of the California Unfair Competition Law, Cal. Bus & Prof. Code § 17200, *et seq*.

H.  Whether Defendant's deceptive pricing scheme using false reference prices constitutes false advertising in violation of the California False Advertising Law under Business & Professions Code § 17500, *et seq*.

I.  Whether Defendant's use of false reference prices on products offered on their Website and/or in stores during the Class Period was

CLASS ACTION COMPLAINT

material.

J.   Whether Defendant had a duty to conspicuously disclose to customers that the reference prices were false former/regular prices.

K.   Whether the members of the Class are entitled to damages and/or restitution.

L.   Whether injunctive relief, including public injunctive relief, is appropriate and necessary to enjoin Defendant from continuing to engage in false or misleading advertising.

M.   Whether Defendant's conduct was undertaken with conscious disregard of the rights of the members of the Class and was done with fraud, oppression, and/or malice.

N.   Whether members of the Class are entitled to an award of reasonable attorneys' fees, interest, and costs of suit.

112.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Requiring each individual Class member to file an individual lawsuit would unreasonably consume the damages that may be recovered. Even if every member of the Class could afford individual litigation, the adjudication of at least tens of thousands of identical claims would be unduly burdensome to the courts. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the members of the Class. Plaintiffs anticipate no difficulty in the management of this action as a class action. The prosecution of separate actions by individual members of

the Class may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to such adjudications, or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

113. **Substantial Similarity.** The products at issue in the action are substantially similar in all material respects. Namely, the products were all advertised with a false reference price, advertised with a strikethrough reference price, and advertised with a false sale price. The products are also all sold by Defendant on the Website and in-store and fall under the umbrella of picture frames, custom picture frames, home décor, floral and wedding products, seasonal products, party supplies, wearable art, hobby products, craft supplies, sewing supplies, furniture, jewelry making supplies, and yarn.

114. **Ascertainability.** Upon information and belief, Defendant keeps extensive records of its customers through its online sales data, as well as through, *inter alia*, general marketing programs. Defendant has one or more databases through which all, or a significant majority of, Class members may be identified and ascertained, and they maintain contact information, including email and home address, through which notice of this action could be disseminated in accordance with due-process requirements.

## VI.  TOLLING OF THE STATUTE OF LIMITATIONS AND DELAYED DISCOVERY

115. All applicable statutes of limitations have been tolled by the delayed discovery doctrine. Plaintiffs and Class members could not have reasonably discovered Defendant's practice of running perpetual and/or extended sales, based on deceptive reference prices and deceptive sale prices, at any time prior to commencing this class action litigation.

116. A reasonable consumer viewing the Website and/or in-store advertisements on multiple occasions would simply believe that a product is on sale for the time period represented on the Website and/or in-store advertisements. Short of

visiting and checking the Website and/or in-store advertisements for months continuously, or using an internet archival device, a reasonable consumer would not suspect that Defendant's sales and pricing practices were false and misleading. Nor would a reasonable consumer be able to ascertain the market value of the products being sold absent extensive investigation, which reasonable consumers would not be on notice to have to do.

117.   Plaintiffs did not learn of Defendant's deceptive practices alleged herein until commencing this action.

118.   As a result, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

<u>**FIRST CAUSE OF ACTION**</u>
**FRAUD (INTENTIONAL MISREPRESENTATION AND OMISSION)**
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the California Subclass)**

119.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

120.   As alleged more fully above, Defendant made false or misleading statements of fact and material omissions concerning the existence of and the amounts of price reductions. These representations were false because: (a) Defendant falsely represents the products as on sale for limited time when in truth the products remain substantially discounted after the sale's purported end date; and (b) the false reference prices advertised in connection with products offered on the Website and in stores misled and continue to mislead customers into believing the products were previously sold on the Website and/or in stores at the higher reference prices on a regular basis for a reasonably substantial period of time. Defendant knew that these representations were false at the time that they made them and/or acted recklessly in making the misrepresentations.

121.   Defendant had a duty to conspicuously disclose the truth about its pricing

deception, including that the reference prices advertised on its Website and in stores were not prices at which Defendant's items were listed or sold on the Website or in stores in the recent past on a regular basis for a reasonably substantial period of time, and in truth, Defendant's products are typically not offered or sold on the Website at the advertised reference prices. Reasonable consumers were likely to be deceived by Defendant's failure to disclose material information.

122. Defendant knew that the items Plaintiffs and the Class purchased had rarely, if ever, been offered or sold on the Website at the substantially higher reference price in the recent past.

123. Defendant's representations were made with the intent that Plaintiffs and the Class would rely on the false representations and spend money they otherwise would not have spent, purchase items they otherwise would not have purchased, and/or spend more money for an item than they otherwise would have absent the deceptive marketing scheme.

124. Defendant's conduct was made with the intent to maximize its profits at the detriment of reasonable consumers.

125. Defendant intended for Plaintiffs and the Class to rely on these representations. Plaintiffs and the Class reasonably relied on Defendant's representations. Absent Defendant's misrepresentations, Plaintiffs and the Class would not have purchased the items they purchased from Defendant, or, at the very least, they would not have paid as much for the items as they ultimately did. Plaintiffs and the Class's reliance was a substantial factor in causing them harm.

126. Had the omitted information been disclosed, Plaintiffs and the Class reasonably would have behaved differently. Among other things, they would not have purchased the items they purchased from Defendant or, at the very least, would not have paid as much for the items as they ultimately did.

127. As a direct and proximate result of the above, Plaintiffs and the Class have

suffered damages because (a) they would not have purchased Defendant's products if they had known that the representations were false, and/or (b) they overpaid for the products because the products were sold at a price premium due to the misrepresentations.

128.   Plaintiffs and the Class are also entitled to punitive or exemplary damages. Defendant, through its senior executives and officers, undertook the illegal acts intentionally or with conscious disregard of the rights of Plaintiffs and the Class, and did so with fraud, malice, and/or oppression. Based on the allegations above, Defendant's actions were fraudulent because Defendant intended to and did deceive and injure Plaintiffs and the Class. Based on the allegations above, Defendant's conduct was made with malice because Defendant acted with the intent to and did cause injury to Plaintiffs and the Class, and because Defendant willfully and knowingly disregarded the rights of Plaintiffs and the Class.

## <u>SECOND CAUSE OF ACTION</u>
### NEGLIGENT MISREPRESENTATION
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the California Subclass)**

129.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

130.   As alleged more fully herein, Defendant made false or misleading statements and/or material omissions of fact concerning the existence of and the amounts of price reductions because, as previously explained: (a) Defendant falsely represents the products as on sale for limited time when in truth the products remain substantially discounted indefinitely after the sale's purported end date; and (b) the false reference prices advertised in connection with products misled and continue to mislead customers into believing the products were offered for sale and/or previously sold at the higher reference prices on a regular basis for a reasonably substantial period of time. When Defendant made these misrepresentations, it knew or should have known that

they were false. Defendant had no reasonable grounds for believing that these representations were true when made.

131.    Defendant had a duty to conspicuously disclose the truth about its pricing deception, including that: (a) the reference prices advertised and published on the Website and in stores were not prices at which Defendant's items had been offered and/or sold on the Website or in Defendant's stores in the recent past on a regular basis for a reasonably substantial period of time; and (b) the expiration of any given sale would be followed by a substantially equivalent sale.

132.    Defendant knew its sales were falsely advertised as being of limited duration. And Defendant knew that the items Plaintiffs and the Class purchased had rarely, if ever, been offered or sold on the Website or in stores at the substantially higher reference price in the recent past.

133.    Defendant had no good faith or reasonable basis to believe that its representations were true when made.

134.    Defendant's representations were made with the intent that Plaintiffs and the Class rely on the false representations and spend money they otherwise would not have spent, purchase items they otherwise would not have purchased, and/or spend more money for an item than they otherwise would have absent the deceptive marketing scheme.

135.    Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy Defendant's products.

136.    Defendant's misrepresentations were a substantial factor and proximate cause in causing damage and losses to Plaintiffs and Class members.

137.    Defendant engaged in this fraud to the Plaintiffs and the Class's detriment to increase Defendant's own sales and profits.

138.    Plaintiffs and the Class reasonably relied on Defendant's representations.

Absent Defendant's misrepresentations, Plaintiffs and the Class would not have purchased the items they purchased from Defendant, or, at the very least, they would not have paid as much for the items as they ultimately did. Plaintiffs and the Class's reliance was a substantial factor in causing them harm.

139.   Had the omitted information been disclosed, Plaintiffs and the Class reasonably would have behaved differently. Among other things, they would not have purchased the items they purchased from Defendant or, at the very least, would not have paid as much for the items as they did.

140.   As a direct and proximate result of the above, Plaintiffs and the Class have suffered damages because (a) they would not have purchased Defendant's products if they had known that the representations were false, and/or (b) they overpaid for the products because the products were sold at a price premium due to the misrepresentations.

**THIRD CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, *et seq.*)**
**(On Behalf of Plaintiffs and the California Subclass)**

141.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

142.   Plaintiffs bring this cause of action on behalf of themselves and members of the California Subclass.

143.   California Business and Professions Code section 17200 *et seq.*, known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any "unfair or fraudulent business act or practice" as well as "unfair, deceptive, untrue or misleading advertising."

144.   Defendant has violated California's UCL by engaging in fraudulent, unfair and unlawful conduct (i.e., violating each of the three prongs of the UCL).

1

*Fraudulent*

2

3    145.    Under the UCL, a business act or practice is "fraudulent" or deceptive if it

4    actually deceives or is likely to deceive members of the consuming public.

5    146.    Defendant's conduct as alleged above is likely to deceive reasonable

6    consumers. As alleged in detail above, Defendant affirmatively misrepresented that its

7    products were on sale by artificially representing much higher reference prices, or

8    "strikethrough" prices which gave the illusion of a discount. Defendant's deceptive

9    marketing gave consumers the false impression that its products were regularly listed or

10   sold on the Website and/or in stores for a substantially higher price.

11   147.    Defendant had a duty to disclose the truth about its pricing deception,

12   including that the reference prices advertised on its Website and/or in stores were not,

13   in fact, prices at which Defendant's items were listed or sold on the Website and/or in

14   stores in the recent past for a reasonably substantial period of time, but in truth, the

15   products never (or rarely) were offered or sold at the reference prices. Reasonable

16   consumers were likely to be deceived by this material omission.

17   148.    Defendant's conduct was and continues to be fraudulent because it has the

18   effect of deceiving consumers into believing they are receiving a product that is worth

19   more than it actually is, by presenting a fake sale price.

20   149.    Defendant's representations were materially misleading to Plaintiffs and

21   other reasonable consumers. Consumers are heavily influenced by price, including

22   significant price reductions of purported limited duration, as employed by Defendant's

23   high-pressure sales tactics.

24   150.    Plaintiffs relied on Defendant's misleading representations and omissions,

25   as detailed above, believing that they were receiving a genuine discount of limited

26   duration from a prevailing and genuine regular and former price.

27   151.    Absent Defendant's misrepresentations, Plaintiffs and the Subclass would

28   not have purchased the items they purchased from Defendant, or, at minimum, they

would not have paid as much for the items as they ultimately did. Plaintiffs and the Subclass's reliance was a substantial factor in causing them harm.

152.   Had the omitted information been disclosed, Plaintiffs would have been aware of it and reasonably would have behaved differently. Among other things, Plaintiffs would not have purchased the items they purchased from Defendant, or, at minimum, would not have paid as much for the items as they did.

153.   As a result of Defendant's fraudulent business acts and practices, Defendant has and continues to fraudulently obtain money from Plaintiffs and members of the Subclass.

***Unfairness***

154.   Under the UCL, a business act or practice is "unfair" if its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims.

155.   As alleged in detail above, Defendant committed "unfair" acts through its deceptive marketing tactics which gave consumers the false impression that its products were regularly listed or sold on the Website for a substantially higher price in the recent past than they actually were and, thus, consumers were led to believe that Defendant's products were worth more than they were.

156.   Defendant violated established public policy by violating the CLRA, the FAL and the FTCA as alleged herein. The unfairness of this practice is tethered to a legislatively declared policy (i.e. that of the CLRA, the FAL, and the FTCA).

157.   The harm to Plaintiffs and the Subclass greatly outweighs the public utility of Defendant's conduct. There is no public utility to mispresenting the price of a consumer product.

158.   Defendant's conduct was and continues to be of no benefit to reasonable consumers. It is misleading, unfair, unlawful, and is injurious to consumers. It is also

against public policy, as it harms fair competition. For example, the FTCA and implementing regulations prohibit advertising a former price "for the purpose of establishing a fictitious [] price on which a deceptive comparison might be based" (16 C.F.R. § 233.1) and prohibit "offer[ing] an advance sale under circumstances where they do not in good faith expect to increase the price at a later date" (16 C.F.R. § 233.5). Similarly, the Lanham Act prohibits "commercial advertising or promotion" that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 41 U.S.C. § 1125(a).

159.    Misleading consumer products only injures healthy competition and harms consumers. Defendant is luring sales away from sellers who compete fairly on price and do not promote false former prices and fake sales of limited duration.

160.    The harm to Plaintiffs and members of the California Subclass outweighs the utility of Defendant's practices. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the unfair conduct described herein.

161.    As a result of Defendant's unfair business acts and practices, Defendant has and continues to unfairly obtain money from Plaintiffs and members of the proposed Subclass.

***Unlawful***

162.    A cause of action may be "unlawful" for purposes of the UCL if a practice violates another law. Such action borrows violations of other laws and treats these violations as unlawful practices independently actionable under the UCL.

163.    By engaging in false advertising, as well as the false, deceptive, and misleading conduct alleged above, Defendant engaged in unlawful business acts and practices in violation of the UCL, including violations of state and federal laws and regulations. Specifically, as detailed herein, Defendant violated 16 C.F.R. §§ 233.1 and 233.5, and California Business & Professions Code section 17501.

* * *

164.   Plaintiffs seek damages and, in the alternative, restitution. Plaintiffs are permitted to seek equitable remedies in the alternative because they have no adequate remedy at law.

165.   A legal remedy is not adequate because it is not as certain as an equitable remedy. The elements of Plaintiffs' equitable claims are different and do not require the same showings as Plaintiffs' legal claims.

166.   In the alternative to claims seeking remedies at law, Plaintiffs and Subclass members allege that there is no plain, adequate, and complete remedy that exists at law to address Defendant's unlawful and unfair business practices. The legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937).

167.   Equitable claims may be tried by the court, whereas legal claims are tried by jury, and the need for a jury trial may result in delay and additional expense. A jury trial will take longer, and be more expensive, than a bench trial. Additionally, unlike damages, the Court has broad discretion to fashion equitable relief, which can be awarded in situations where the entitlement to damages may prove difficult. Thus, restitution would allow recovery even when normal consideration associated with damages would not. Furthermore, the standard, showing, and necessary elements for a violation of the UCL "unlawful" and "unfair" prongs are different from those that govern legal claims.

168.   Plaintiffs, on behalf of themselves and the members of the Subclass, seek restitution and restitutionary disgorgement of all moneys received by Defendant through the conduct described above.

169.   Plaintiffs, on behalf of themselves and the members of the Subclass, seek a public injunction from this Court prohibiting Defendant from engaging in the patterns

CLASS ACTION COMPLAINT

and practices described herein, including putting a stop to the deceptive advertisements and false reference prices in connection with the sale of products on the Website. Plaintiffs seek an injunction on behalf of themselves, the putative class of similarly situated California residents, and the general public, prohibiting Defendant from making material omissions and misrepresentations to the public about its deceptive pricing practices. Plaintiffs seek a public injunction requiring Defendant to notify the public at large about its deceptive pricing practices, including through corrective advertising. The public injunction is essential to eradicating Defendant's deceptive scheme. In the absence of an injunction, Defendant will remain free to continue to mislead unsuspecting members of the public about its pricing scheme, causing consumers to believe they are getting items at a discount or sale price, when, in reality, they are not.

170. Plaintiffs and Subclass members are entitled to public injunctive relief. On information and belief, the dissemination of Defendant's false and misleading advertising is ongoing. The public injunctive relief will protect the public from Hobby Lobby's deceitful marketing practices which misrepresent and omit material facts about Defendant's pricing practices.

## FOURTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
### CAL. BUS. & PROF. CODE § 17500, *et seq*.
### (On Behalf of Plaintiffs and the California Subclass)

171. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

172. Plaintiffs bring this cause of action on behalf of themselves and members of the California Subclass.

173. Defendant has violated Sections 17500 and 17501 of the Business and Professions Code.

174. The California False Advertising Law, codified at California Business & Professions Code section 17500, *et seq*. (the "FAL") provides that it is unlawful for any

business, with intent directly or indirectly to dispose of personal property, to make or disseminate in any "manner or means whatever, including over the Internet, any statement, concerning that . . . personal property . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading[.]" Cal. Bus. & Prof. Code § 17500. The "intent" required by section 17500 is the intent to dispose of property, and not the intent to mislead the public in the disposition of such property.

175.   A separate section of the FAL, Cal Bus. & Prof. Code § 17501, provides:

For the purpose of this article the worth or value of any ***thing advertised*** is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a ***former price*** of any advertised thing, unless the alleged former price was the ***prevailing market price*** as above defined within ***three months next immediately preceding*** the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement. (emphasis added)

176.   As used in Cal Bus. & Prof. Code § 17501:

The term "advertised thing" refers to the exact same product offered—***not*** an equivalent or similar product. *People v. Superior Ct.* (*J.C. Penney Corp.*)*,* 34 Cal. App. 5th 376, 412 (2019) ("if the advertisement specifies a precise item— say, by reference to name, brand, or other distinctive features . . . the market and therefore the market price is potentially determined on the basis of sales of ***that item only***.") (emphasis added).

CLASS ACTION COMPLAINT

The term "'former price' . . . includes but is not limited to the following words and phrases when used in connection with advertised prices; 'formerly—,' 'regularly—,' 'usually—,' 'originally—,' 'reduced from ___,' 'was ___ now ___,' '___% *off*.'" 4 Cal. Code Regs., § 1301 (emphasis added).

The term "prevailing market price" refers to the "retail [price] if the offer is at retail." Cal Bus. & Prof. Code § 17501 (emphasis added).

177.    Defendant has violated, and continues to violate, Section 17500 of the Business & Professions Code by disseminating untrue and misleading advertisements over the internet and in stores to Plaintiffs and members of the California Subclass.

178.    As explained above, Defendant regularly advertised false and misleading reference prices for the products offered for sale on the Website and in its stores, including to Plaintiffs and members of the California Subclass. Defendant does this by, for example, crossing out a higher price or by displaying a discount price next to the "regular" price. Reasonable consumers would understand prices denoted as "regular" prices from which time-limited discounts are calculated to denote a "former" price of that product, i.e., the prices that Defendant charged before the limited time discount or sale went into effect.

179.    Additionally, Defendant has violated, and continues to violate, Section 17501 of the Business & Professions Code by advertising former prices that were not the prevailing market price within three months immediately preceding the advertisements.

180.    Defendant rarely, if ever, offered products on the Website and/or in stores at the reference prices within the three months immediately preceding the publication of the reference prices.

181.    On information and belief, Defendant did not verify that the advertised reference prices were the prevailing market prices within the preceding three months.

And Defendant's former price advertisements do not state clearly, exactly, and conspicuously when, if ever, the former prices prevailed. Defendant's advertisements do not indicate whether or when the purported former prices were ever offered at all.

182.   Defendant's deceptive marketing practice gave consumers the false impression that its products were regularly offered and sold for a substantially higher price in the recent past than they were and, thus, led to the false impression that Defendant's products were worth more than they were and were being offered at discounted rates.

183.   Defendant knew that its advertised reference prices for the products sold on its Website and in stores were untrue and/or misleading. Defendant knew that such products had rarely, if ever, been offered or sold on the Website or in stores at the reference prices.

184.   Defendant's practices were intended to induce reliance, and Plaintiffs saw, read, and reasonably relied on the misrepresentations when purchasing Hobby Lobby's products. Defendant's misrepresentations were a substantial factor in Plaintiffs' purchasing decisions.

185.   Additionally, Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy Defendant's products.

186.   As a direct and proximate result of Defendant's misleading and false advertisements, Plaintiffs and members of the California Subclass have suffered injury in fact and have lost money. Plaintiffs request restitution and an injunction prohibiting Defendant from continuing their false and misleading advertising practices in violation of California law in the future.

187.   Plaintiffs and California Subclass members are entitled to injunctive relief, including public injunctive relief. On information and belief, the dissemination of Defendant's false and misleading advertising is ongoing. Plaintiffs seek an injunction

on behalf of themselves, the putative class of similar situated California residents, and the general public, prohibiting Hobby Lobby's from making material omissions and misrepresentations to the public about its deceptive pricing practices. Plaintiffs seek a public injunction requiring Defendant to notify the public at large about its deceptive pricing practices, including through corrective advertising. The public injunction is essential to eradicating Defendant's deceptive scheme. In the absence of an injunction, Defendant will remain free to continue to mislead unsuspecting members of the public about its pricing scheme, causing consumers to believe they are getting items at a discount or sale price, when, in reality, they are not.

188.   In the alternative to those claims seeking remedies at law, Plaintiffs and Subclass members allege that there is no plain, adequate, and complete remedy that exists at law to address Defendant's unlawful and unfair business practices. The legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937). For example, equitable claims may be tried by the court, whereas legal claims are tried by jury, and the need for a jury trial may result in delay and additional expense. A jury trial will take longer and be more expensive than a bench trial. Additionally, unlike damages, the Court has broad discretion to fashion equitable relief, which can be awarded in situations where the entitlement to damages may prove difficult. Thus, restitution would allow recovery even when normal consideration associated with damages would not. Furthermore, the standard, showing, and necessary elements for a violation of the FAL under Cal Bus. & Prof. Code § 17501 are different from those that govern legal claims.

## FIFTH CAUSE OF ACTION
### VIOLATION OF THE CALIFORNIA
### CONSUMER LEGAL REMEDIES ACT, CAL. CIV. CODE § 1750, *et seq*.
### (On Behalf of Plaintiffs and the California Subclass)

189.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs

as if fully set forth herein.

190. Plaintiffs bring this claim on behalf of themselves and members of the California Subclass.

191. The Consumer Legal Remedies Act, Cal. Civ. Code sections 1750 *et seq.* (the "CLRA"), is a California consumer protection statute which allows plaintiffs to bring private civil actions for "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction . . . which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

192. Plaintiffs and members of the California Subclass are "consumers" as defined in California Civil Code § 1761(d).

193. The products purchased by Plaintiffs and the Subclass are "goods" within the meaning of California Civil Code section 1761(a).

194. Defendant's sale of products on the Website and in stores to Plaintiffs and the Subclass were "transactions" within the meaning of California Civil Code section 1761(e).

195. Defendant violated and continues to violate the CLRA by engaging in the following practices prohibited by California Civil Code section 1770(a) in transactions with Plaintiffs and the Subclass which were intended to result in, and did result in, the sale of Defendant's products:

      A.   Representing that goods do have characteristics they do not actually have (Cal. Civ. Code § 1770(a)(5));

      B.   Misrepresenting that goods are of a particular standard, quality, or grade (Cal. Civ. Code § 1770(a)(7));

      C.   Advertising goods or services with intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9));

      D.   Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions (Cal. Civ. Code §

1    1770(a)(13)).

2    196.   With regards to section 1770(a)(5), (7), and (9), Defendant advertised and

3    represented products on the Website and in stores with the "intent not to sell" them as

4    advertised and misrepresenting product characteristics and standard because: (a) the

5    false reference prices advertised in connection with products offered on the Website

6    and/or in stores misled and continue to mislead customers into believing (i) the

7    merchandise was previously offered for sale and/or sold on the Website and/or in its

8    stores at the higher reference prices on a regular basis for a reasonably substantial period

9    of time, and (ii) were valued in the market at the advertised "regular" price; and (b)

10   Defendant falsely represents the products as on sale for limited time when in truth the

11   products remain substantially discounted indefinitely after the sale's purported end date.

12   197.   With respect to section 1770(a)(13), Defendant made false or misleading

13   statements of fact concerning the "existence of" and the "amounts of price reductions"

14   because: (a) no true price reductions existed in that Defendant's merchandise was rarely,

15   if ever, offered for sale and/or sold at the higher reference prices, let alone on a regular

16   basis for a reasonably substantial period of time; (b) the reference prices Defendant

17   advertised in connection with its products were not prevailing market prices because,

18   on information and belief, the products were not previously sold by Defendant at the

19   reference prices for a reasonably substantial period of time; and (c) Defendant falsely

20   represents the products as on sale for limited time when in truth the products remain

21   substantially discounted indefinitely after the sale's purported end date.

22   198.   Additionally, Defendant had a duty to conspicuously disclose the truth

23   about their pricing deception, including that the reference prices advertised on the

24   Website and/or in stores were not prices at which Defendant's items were listed or sold

25   on the Website or in Defendant's stores in the recent past on a regular basis for a

26   reasonably substantial period of time, and in truth, Defendant's products are typically

27   not offered or sold on the Website (and/or in Defendant's stores) at the advertised

28

reference prices. Defendant also failed to disclose that the expiration of any given sale, the products would remain substantially discounted.

199.   Defendant's representations were likely to deceive, and did deceive, Plaintiffs and reasonable consumers. Defendant knew or should have known through the exercise of reasonable care that these statements were false and misleading.

200.   Defendant's misrepresentations were intended to induce, and did induce, reliance. Plaintiffs saw, read, and reasonably relied on the misrepresentations when purchasing Hobby Lobby's products.

201.   Defendant's misrepresentations were a substantial factor in Plaintiffs' purchasing decisions. Absent Defendant's misrepresentations, Plaintiffs and the Subclass would not have purchased the items they purchased from Defendant, or, at the very least, they would not have paid as much for the items as they did. Plaintiffs and the California Subclass's reliance was a substantial factor in causing them harm.

202.   Had the omitted information been disclosed, Plaintiffs and the California Subclass reasonably would have been aware of it and behaved differently. Among other things, Plaintiffs and the California Subclass would not have purchased the items they purchased from Defendant or, at the very least, would not have paid as much for the items as they did.

203.   Contemporaneous with the filing of this Complaint, Plaintiffs, through counsel, will provide notice to Defendant pursuant to Cal. Civ. Code § 1782(a) via certified mail. As the 30-day response period has not yet lapsed, Plaintiffs claim no damages pursuant to this count, but will timely amend this Complaint after expiration of the response period to seek money damages and punitive damages under the CLRA. At this time, Plaintiffs seek only injunctive or other equitable relief under the CLRA as described above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class,

respectfully pray for following relief:

    A.    Certification of this case as a class action on behalf of the proposed Class and any Subclasses defined above, appointment of Plaintiffs as Class representatives, and appointment of their counsel as Class counsel;

    B.    An award to Plaintiffs and the proposed Class and Subclass of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits Defendant obtained from Plaintiffs and the proposed Class as a result of its unlawful, unfair and fraudulent business practices described herein;

    C.    An injunction, including public injunctive relief as described herein, ordering Defendant to cease the false advertising and unfair business practices complained of herein;

    D.    An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendant's conduct;

    E.    An award of nominal, punitive, and statutory damages where available;

    F.    Reasonable expenses and attorneys' fees;

    G.    Pre- and post-judgment interest, to the extent allowable; and

    H.    For such further relief that the Court may deem just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs, individually and on behalf of the proposed Class, demand a trial by jury for all claims so triable.

Date: December 18, 2024           Respectfully submitted,

                                  */s/Jonathan Shub*
                                  Jonathan Shub (SBN 237708)
                                  Samantha E. Holbrook *(pro hac vice* forthcoming)

CLASS ACTION COMPLAINT

Andrea L. Bonner *(pro hac vice* forthcoming)
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (610) 477-8380
*jshub@shublawyers.com*
*sholbrook@shublawyers.com*
*abonner@shublawyers.com*

*Attorneys for Plaintiffs and the Class*

CLASS ACTION COMPLAINT